## THE EDWIN POST.

*(District Court, D. Delaware. April, 1882.)*

1. VESSEL—APPARATUS AND APPLIANCES—TACKLE.

     Special apparatus or appliances on board of a vessel engaged in a particular avocation, as whaling or wrecking, which are indispensable to the proper prosecution of such business, and not constituting in any sense a portion of the cargo, are component parts of the tackle, apparel, and furniture of such vessel, and liable as such for seamen's wages and contracts for supplies entered into in good faith with the master.

2. SAME—SUBJECT TO ATTACHMENT.

     The attachment of such apparatus or material, under the authority of the writ against such vessel, her tackle, apparel, and furniture, is good.

3. SAME—SEPARATE OWNERSHIP.

     The fact that the ownership of the vessel and of such apparatus is separate will not be sufficient to exempt such apparatus from liability if in fact it was on board the vessel by the consent of its owners at the time of such seamen's shipment, or supplies furnished in good faith, and thus furnished an inducement for the service in the one case and the credit in the other.

In Admiralty. Upon the petition of the Coast Wrecking Company of New York to release certain property of petitioners from attachment.

*John C. Patterson,* for intervenors.

*Charles B. Lore,* for respondents.

BRADFORD, D. J. This is an application by the Coast Wrecking Company, chartered under the laws of the state of New York, to have certain wrecking material, apparatus, and machinery, placed on board the schooner Edwin Post to be used for the purposes of wrecking, released from attachment of the United States marshal upon libels for seamen's wages and supplies, as not constituting a part of the furniture, tackle, and apparel of said schooner. This material consisted of one eleven-inch cable, one nine-inch cable, and one five-inch fall, one set of eighteen-inch purchase blocks, two cargo blocks, one set of watch tackles and falls, one large chock, one twenty-inch Worthington pump, one Donkey pump, one boiler and connections, and one steam hoister, two anchors, and one diving apparatus. It appears by the testimony of Mr. Seymour, storekeeper and agent in the absence of the general superintendent of said company, that the said material was sent to Lubker, at Lewes, Delaware bay, by the order of I. J. Merritt, the general superintendent of the said company, and it also appears from the same testimony that the schooner Edwin Post, upon which said material was afterwards placed, was sent to Lubker by the order of the same person. There is some conflict of testimony as to the times and circumstances under which this material was used, and whether or not the whole of said wrecking material was kept always on board the schooner. The conclusion which the court draws from all the testimony, however, is that as much of this apparatus as was necessary to fit this vessel out for wrecking purposes was used whenever occasion required it; nor is the strength of this position weakened by the fact, even if the proof sustains it, that all of it may not have been required upon the vessel at any one time.

Considering the character and purposes of this Coast Wrecking Company, and the fact that this wrecking material had been sent to a given point to be used for the purposes of wrecking, and the further fact that the schooner Edwin Post was forwarded to Captain Lubker, who was engaged in that business almost exclusively, it is almost a necessary inference that this wrecking material was placed on board of said vessel with the knowledge and consent of the said company. Indeed, from the evidence of Capt. Lubker himself it appears that the only money settlements he made for the use of the vessel and material

were made with the company while he was carrying on this business as a wrecker. There do not appear to be any authorities directly upon the point determining whether such material would be responsible on a libel filed for seamen's wages against the ship, her tackle, apparel, and furniture. The law bearing upon the case appears to be laid down by Lord Stowell in the case of *The Dundee*, 1 Hag. 120, and forms at least an approximation to the rule by which the court should be governed. This was a case of collision. The Dundee was a whaling ship, and ran into and sank the Princess Charlotte in the river Thames. The action was to enforce the liability of the fishing stores on board the Dundee to contribute for the damages done. The question turned principally upon the construction of the word "appurtenances," substituted in the latter clause of the act of 53 Geo. III. c. 159, limiting the responsibility of ship-owners, etc., for the words "tackle, apparel, and furniture" in the enacting clause of said act. For if the fishing stores were construed to be "appurtenances," a word of almost similar import with tackle, apparel, and furniture, then they were liable, under the express terms of the act, to contribute, inasmuch as they belonged to the owners of the Dundee; and if not construed to be "appurtenances," then, of course, they were exempt. Lord Stowell expressed himself in the following language:

"But those accompaniments that are essential to a ship in its present occupation not being cargo, but totally different from cargo, though they are not direct constituents of the ship, (if, indeed, they were, they would not be appurtenances, for the very nature of an appurtenance is that it is one thing which belongs to another thing,) yet if they are indispensable instruments, without which the ship cannot execute its mission and perform its functions, it may in ordinary loose application be included under the term 'ship,' being that which may be essential to it,—as essential to it as any part of its own immediate machinery."

And also:

"It may not not be a simple matter to define what is and what is not an appurtenance of a ship. There are some things that are universally so— things which must be appurtenant to every ship—*qua* ship, be its occupation what it may. But I think it rather gratuitously assumed that particular things may not become so from their immediate and indispensable connection with a ship in the particular occupation to which she is destined and in which she is engaged. A ship may have a particular employment assigned to her which may give a specialty to the apparatus that is necessary for that employment. * * * The word 'appurtenances' must not be construed with a mere reference to the abstract, naked idea of a ship, for that which would be an encumbrance to a ship one way employed would be an indispensable equip-

ment in another, and it would be a preposterous abuse to consider them alike in such different positions—you must look to the relation they bear to the actual service of the vessel."

The case was afterwards argued on an application for a writ of prohibition at the sittings in banc before Easter term, 6 Geo. IV. of the court of king's bench, *Gale* v. *Laurie*, 5 Barn. & C. 156, and the judgment of the court was delivered by Chief Justice Abbott, and sustained the reasoning and confirmed the views of Lord Stowell in the original case. The chief justice says: "The ship in question was in the prosecution of a voyage in which no freight could be carried. The fishing stores were not carried on board the ship as merchandise, but for the accomplishment of the objects of the voyage; and we think that whatever is on board a ship for the object of the voyage and adventure on which she is engaged, belonging to the owners, constitutes a part of the ship and her appurtenances within the meaning of *this act*, whether the object be warfare, the conveyance of passengers or goods, or the fishery.

The act referred to (53 Geo. III. *c.* 159) provides that no owner, etc., of any ship shall be liable to answer for any loss or damage, etc., further than the value of his or their ship or vessel, etc., and her appurtenances. And the ownership of the fishing stores and of the ship being admitted to be in the same persons, the only question before the court was whether fishing stores were included under the term "appurtenances," and the court decided they were.

This case (*The Dundee*) is authority upon the point that fishing stores on board a vessel are included under the term "appurtenances," and are responsible under the English act for contribution if belonging to the owners of the vessel in an action for damages by collision.

Under the ancient maritime law the property of the owner, wherever found, was liable for the tort of the master as the agent of the owner, and successive acts of parliament were passed limiting this liability to the property of the owner on board the vessel. In this respect our own congressional laws are somewhat similar. But there is a wide divergence between an action for damages for a tort and an action for seamen's wages or supplies. In the latter cases it has been invariably held that the ship, tackle, apparel, and furniture are responsible, but in the former the express terms of the law wisely limits the responsibility to the owner's interest in the vessel, her tackle, apparel, and furniture. The law applicable in the former case, we think, would not be applicable in the latter, and the only inquiry here, therefore, is whether the wrecking apparel on

board said vessel was part of the tackle, apparel, and furniture of the same. If so, they are clearly liable. With even greater liberality than in cases of insurance or collision, I think courts of admiralty should construe the ancient terms, "tackle, apparel, and furniture," in the interest of seamen's wages. They are said to be the words of admiralty peculiarly liable to imposition, deception, and the wiles of unscrupulous men, and therefore specially under the protection of the courts:

In this case there has been no satisfactory proof of the separation of the ownership of the ship and wrecking apparatus. It is alleged that Merritt, the general manager of the wrecking company, is the owner of the vessel, and the testimony of Seymour, a subordinate employe of the company, and Lubker the master, who originally refused to pay the wages, alone sustain it. Seymour merely asserts the fact without stating his means of knowledge, and Lubker says Merritt told him so. But, although every opportunity has been offered, no certified copies of custom-house records showing the ownership of the vessel in Merritt have been put in evidence, and I am disinclined to assume, upon such unsatisfactory testimony as has been offered on the point, that Merritt was the *bona fide* owner of the ship, in the face of the admitted facts that he was the general agent of the wrecking company; that the possession of both vessel and material in Lubker came through his hands; and of the admission by Lubker that the only settlements for the use of the ship and material which he ever made were made with the company.

The wrecking company having voluntarily placed the material on board the vessel, and having thus furnished an inducement to the sailors to enlist in this hazardous service, I do not feel it would be right to exonerate the vessel from the liability imposed upon the ship, her tackle, etc., to satisfy seamen's wages and contracts entered into in good faith, for no other reason than the alleged separate ownership of the vessel and material.

I think, therefore, upon a review of all the circumstances of this case, that this wrecking apparatus seized by the marshal was a part of the ship, her tackle, apparel, and furniture, by reason of its immediate and indispensable connection therewith, in the particular occupation to which she was destined and in which she was engaged, and as such was responsible jointly with the rest of the ship, tackle, apparel, and furniture for payment of seamen's wages and supplies.

I shall direct the intervenor's petition to be dismissed, with costs in both cases.