---

## THE HOPE.

(District Court, D. Massachusetts, June 10, 1911.)

### No. 397.

1. MARITIME LIENS (§§ 3, 37*)—PROPERTY SUBJECT TO LIEN—FURNITURE OF VESSEL—"TACKLE, APPAREL, AND FURNITURE."

An engine placed on a gas launch to furnish her motive power, and which was essential to her equipment, became a part of her "tackle, apparel, and furniture," and subject to liens against her for repairs or supplies, notwithstanding a reservation of title in the seller until payment of the purchase price, of which reservation those furnishing the repairs and supplies were not chargeable with knowledge or notice.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 3; Dec. Dig. §§ 3, 37.*

For other definitions, see Words and Phrases, vol. 7, p. 6491.]

2. MARITIME LIENS (§ 3*)—PROPERTY SUBJECT TO LIEN—NET LIFTER ON FISHING BOAT.

A net lifter and motor for operating the same, placed on a fishing boat under a contract of sale to the owner, which reserved title in the seller until full payment of the purchase price, and which, although not fully paid for, was allowed to remain until long after the payments were due, was subject to liens for repairs and supplies furnished by persons having no knowledge of such reservation of title.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 3; Dec. Dig. § 3.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Admiralty. Suit by the Booth Fisheries Company against the gas screw launch Hope. Decree for libelant and determining priority of liens.

Blodgett, Jones & Burnham, for libelant.

William A. Pew, Jr., for claimant.

Frederick H. Tarr, for Gorton-Pew Fisheries Co.

J. M. Marshall, for John W. Atwood.

Edgar S. Taft and William A. Pew, Jr., for intervening petitioners.

DODGE, District Judge. This is a libel for supplies claimed to have been furnished the Hope between August 23, 1910, and March 14, 1911. The amount claimed for supplies is $853.64. The libelant also alleges that it holds a mortgage on the Hope, dated April 23, 1910, to secure a note of the owner for $500. It asks that the vessel be sold to pay the amount due for supplies, and that its mortgage may be satisfied out of the proceeds according to its order of priority. The vessel was arrested by the marshal April 12, 1911. Not having been released, she has since been sold by the marshal, as hereinafter stated.

On April 22, 1911, a petition to intervene was filed by Brown Bros. Co., of Gloucester, which sets forth a claim amounting to $298.76 for repairs and supplies furnished between October 3, 1910, and March 11, 1911. On April 27, 1911, Henry H. Newberry filed an intervening petition, which claims $29.50 for wages earned as a fisherman on board the Hope. On the same day Thomas E. Reed, of Gloucester, filed an intervening petition, claiming salvage compensation for raising the Hope after she had been sunk in Gloucester Harbor March 14, 1911.

On May 1, 1911, Gorton-Pew Fisheries Company, of Gloucester, filed an intervening petition, alleging that it is the owner of the engine on the Hope, claiming the engine as against the owner of the Hope, and asking for its restoration, subject to such lien claims as may be established against it.

Also on May 1, 1911, John W. Atwood, of Gloucester, filed an intervening petition, claiming a net lifter with motor attachment on the Hope as belonging to it, and asking for its restoration, subject to such liens as may be established against it.

On April 18, 1911, Carleton H. Parsons, of Gloucester, administrator of the estate of Charles E. Anderson, filed an answer to the original libel, in which it is alleged that Anderson was sole owner of the Hope, her boats, engine, tackle, apparel, and furniture, mentioned in the libel, from August 23, 1910, to March 14, 1911, on which day the Hope sunk, as above stated, and Anderson was drowned. This answer neither admits nor denies the allegations of the libelant as to the furnishing of supplies, and calls upon the libelant to prove them.

There is no dispute that the Hope was sunk by collision in Gloucester Harbor on March 14, 1911, nor that the petitioner. Thomas E. Reed thereafter raised her, with the engine and net lifter above referred to on board, and brought her ashore at Gloucester. Nor is it disputed that his claim for salvage compensation attached upon the boat, the engine, and the net lifter. Nor is it disputed that the peti-

tioner Newberry's claim for wages is in like manner valid against the boat, the engine, and net lifter. It is contended, however, that the claims of the two materialmen are not valid, except against the boat herself, and cannot be maintained against either the engine or the net lifter. The present hearing has been to determine the merits of this contention. Immediately after the raising of the boat, the Gorton-Pew Fisheries Company detached the engine from the boat, took possession of it, and carried it off. It was later surrendered to the marshal, who claimed it under the process issued in this case; the Gorton-Pew Company reserving all its rights. The net lifter was in place on board the boat when she was arrested by the marshal. Under an interlocutory order of sale issued May 5, 1911, the boat, net lifter, and engine have been sold; the total gross proceeds received being $990. For the purpose of preserving the rights of all parties under the questions raised, it was ordered that the hull, net lifter, and engine be sold separately. The hull brought $160, the net lifter $125, and the engine $705.

It appeared that Anderson, the sole owner of the boat, bought the engine from the Gorton-Pew Company January 3, 1911. The agreement between them was that the engine should be his and he should have a bill of sale of it when he should have paid the Gorton-Pew Company $800 for it. He paid $100 down, and agreed to pay the company half the boat's earnings until the remaining $700 should be paid. A discount was to be made in case the engine should be fully paid for in this way before July 1st. The company was to insure the engine in its own name. Anderson was to pay the cost of insurance. Nothing more than the $100 had been paid at the time the boat sunk, nor had the company ever had the engine insured as agreed. The boat was in Gloucester when the engine was purchased as above, and the engine delivered to her there. It took the place of an engine, said to have been worn out, which had previously supplied her motive power. It remained in use on board, constituting her motive power, until the Hope sank as above stated. While it was thus in use on board, Anderson employed the Hope in his business of fishing, making trips in her out of Gloucester.

[1] I think these facts require me to regard the engine as part of the Hope's "tackle, apparel, and furniture," and part, therefore, of what was subject to all liens valid against her when she sank, for repairs or supplies, whether furnished before or after the engine was put in. Such repairs or supplies must obviously have been furnished upon the security of a complete gas screw launch, not upon the security of a mere hull devoid of motive power. This engine was attached to the Hope, it was part of her general equipment as a vessel, it was not on board for a special purpose only, and an engine was essential to her equipment. See The Witch Queen, 3 Sawy. 201, Fed. Cas. No. 17,916; The Edwin Post (D. C.) 11 Fed 602; The Mildred, 43 Fed. 393. Against a materialman not charged with knowledge or notice of any reservation of title to the engine by the Gorton-Pew Company, if such reservation there was, I do not see how anything of the kind can be set up to defeat the lien. I find nothing in the

evidence sufficient to charge either Booth Fisheries Company or Brown Bros. with such knowledge or notice.

[2] The net lifter, including a small motor engine whereby it was operated, was put into the Hope in July, 1909. She was at the time employed in fishing on the Great Lakes, and the net lifter was furnished at Charlevoix, Mich. She continued to be employed on the Lakes from that time until about October 1, 1910, when Anderson brought her to Gloucester and began to employ her there. There was a written agreement between the intervening petitioner Atwood, who furnished the engine, and Anderson, dated July 20, 1910, a copy whereof is annexed to Atwood's petition. The agreement was to sell Anderson the net lifter and motor for $400, $100 down and six payments of $50 each on or before the 1st days of the five next succeeding months and June 1, 1910. For these six payments Anderson gave notes, each reciting that it was secured by the contract. The agreement provided for a bill of sale upon full payment, the ownership to remain with Atwood meanwhile, and payment on account to be considered rental until full payment. Upon failure to make the agreed payments, Atwood was to have the right to take possession.

When in place on the Hope, the net lifter was fastened down and was inside a house. It was a patented contrivance in use on a few such boats only, and it saved the labor of one or two men. Anderson used it on the Lakes, and afterward when fishing from Gloucester. He had paid $250 of the agreed $400 when the boat sank. At that time the last three payments, as will be seen, had been for a considerable time overdue, but there had been no attempt on Atwood's part to take possession.

In The Merrimac (D. C.) 29 Fed. 157, decided in this court in 1886, Judge Nelson held a seine boat, accompanying a fishing vessel and used by her in her business, not appurtenant to her, so as to be subject to a lien valid against her, when not owned by her owners but hired by them. The seine boat could not be carried on board the fisherman, and such boats were shown to be quite as often hired as owned by the owners of the vessels they accompanied. But, even if the net lifter in the present case be regarded as hired by the Hope's owner, to those who did not know the facts it would seem as much appurtenant to the boat as any other appliance in use on board her. Nor is there any evidence from which I can conclude that such net lifters are quite as often hired as owned. Though the contract with Atwood, dated July 20, 1909, is witnessed by a representative of the Booth Company, I do not think the evidence goes far enough to charge them with knowledge of the fact that on August 23, 1910, when they began to furnish the articles for which they now claim, $150 remained due for the engine, under that contract, which ought to have been all paid on June 1, 1910, and $100 of it long before that date. After leaving the net lifter in possession of the Hope's owner and in use on board her for so long a time after he might have taken possession of it because of the nonpayment of these amounts, he is hardly in a position to say, as against a materialman, that it did not belong to the Hope. By section 3 of the act of June 23, 1910 (36 Stat. 604, c. 373), a ma-

terialman gets no lien when charged with knowledge that a charter of a vessel exists under which the person ordering the supplies is without authority to bind the vessel; but the argument from these provisions does not go far enough, in my opinion, to cover this case.

I must therefore hold that all the proceeds in the marshal's hands are subject to the above-mentioned liens for salvage, wages, and repairs or supplies, in the order of their rank, pro rata.