## THE HIRONDELLE.

### No. 2313.

District Court, S. D. Alabama.
Nov. 13, 1937.

Harry T. Smith & Caffey, of Mobile, Ala., for Radiomarine Corporation.

Thomas Hamilton and J. Gaillard Hamilton, both of Mobile, Ala., for lien claimants.

Pillans, Cowley & Gresham, of Mobile, Ala., for mortgagee.

ERVIN, District Judge.

The steamship Hirondelle was libeled and ordered sold; the Radiomarine Corporation of America intervened and moved that the radio outfit and the automatic alarm equipment on board the ship be set apart to it and not sold with the ship.

The above motion or petition coming on to be heard, there appeared all of the parties in interest, through their proctors of record, and the court, having heard the testimony offered in support of said motion or petition, finds the facts as follows:

The Radiomarine Corporation of America is a corporation organized under the laws of the state of Delaware, and on the 1st day of July 1937, and for a long time prior thereto, said corporation was engaged in the marine communications business, which said business it operated as a com-

mon carrier subject to regulation by, and in fact regulated by, the Federal Communications Commission. In the conduct of said radio marine communications business, it had acquired and owned 14 coastal radio stations and equipment located on the Pacific and Atlantic Coasts, the Gulf of Mexico, and the Great Lakes; which said coastal stations were, and are, so equipped as to be able to send and receive messages to and from ships hundreds of miles distant from such stations. In addition, said corporation operated 13 service stations in or near the principal ports of the United States for the purpose of maintaining ship radio telegraph apparatus, which said stations were in charge of highly skilled radio service men, capable of installing and maintaining such apparatus. Said corporation also operates, and at the time above referred to, operated as a part of its said public service business approximately 1,000 radio telegraph stations on board ships. These stations were likewise operated as common carrier and public service stations licensed and regulated by the Federal Communications Commission, and as part of their service were required to act, and did act, as relay stations for vessels of every type and of every nation forwarding messages requested to be relayed.

That the principal business of the Radiomarine Corporation of America was the conduct of such common carrier communications system, but that the Radiomarine Corporation, as a part of its business, also manufactured or acquired marine radio equipment of the kind involved in this suit; that in some instances such equipment was sold to shipowners and operated by Radiomarine Corporation of America as a public service station aboard ship under agreement with the respective shipowners, but that in many cases, such equipment is not bought by the shipowners because of the comparatively high cost of such equipment coupled with such rapid development of the art of radio communications as to render such equipment in danger of becoming obsolete at any time, but is installed under contracts similar to those involved in this suit, which are hereinafter referred to.

That where the equipment is not bought by the steamship owners, an agreement or arrangement is entered into between the steamship owners and the Radiomarine Corporation of America, whereby the shipowners, in order to obtain the radio telegraph service, enter into an agreement by which the Radiomarine Corporation undertakes to install marine radio equipment on board the vessel and to operate the same as a public service ship station, and in order to obtain this service, the steamship owners agree, among other things, to pay monthly charges on account of the operation of the ship station and the maintenance of the commercial radio telegraph service, and on account of the furnishing and maintaining of the apparatus, but said shipowners are entitled to receive a proportion of the tolls received from the operation of said ship stations.

That the equipment installed by the Radiomarine Corporation under such conditions is by express agreement of the parties, to be and remain the property of the Radiomarine Corporation of America, and is to be used by it as the equipment of the radio ship station which it agreed to operate aboard ship.

That the marine Radio equipment installed aboard the Steamship Hirondelle, namely, 1 ET–8006 transmitter; 1 ET–8003 emergency transmitter; and 1 AR–8503 receiver, was installed by Radiomarine Corporation of America under a written contract with the Rhode Island Navigation Company, owner of steamship Hirondelle, dated July 1, 1937, in and by the terms of which it was agreed that said apparatus would be installed by Radiomarine Corporation of America on the ship for use in a ship station to be licensed, operated, and maintained aboard ship by Radiomarine Corporation of America as a commercial radio telegraph service for use by the general public for a term of three years from the date thereof, and unless terminated by sixty days' notice in writing to continue thereafter for yearly periods.

That it was provided in and by the terms of said contract that the apparatus furnished by the Radiomarine Corporation of America, under said agreement, should at all times be the property of, and the legal title thereto should remain in, the Radiomarine Corporation of America, and that no title thereto, or interest therein, should pass to the ship company, namely, the Rhode Island Navigation Company by virtue of the agreement, and that it was further provided, in and by the terms of said agreement, that at the termination of

the agreement the apparatus furnished by the Radiomarine Corporation of America, pursuant thereto, should be dismantled by the Radiomarine Corporation of America and returned by, and at the expense of, the ship company to the Radiomarine Corporation of America at its nearest service station in the United States in good condition, reasonable wear and tear excepted.

That in order to obtain the benefit of the service of said commercial ship radio station aboard the said steamship Hirondelle, the Rhode Island Navigation Company agreed to pay the cost and expense of installing said apparatus aboard the vessel, and agreed to provide such suitable space as was necessary for the ship station provided for in the agreement, and to furnish and pay for the erection of masts and mast fittings, blocks and halyards, and generally to pay all other expenses in connection with the installation of the apparatus, and it further agreed to pay the wages of the licensed radio operators necessary for the operation of such ship station, and also agreed to pay certain fixed annual charges on account of the maintenance of said apparatus and on account of the operation of the ship station and the maintenance of the said commercial radio telegraph service.

That the automatic alarm equipment, viz., 1 A R 8600 auto alarm, was installed on said vessel under agreement between the Radiomarine Corporation of America and the Rhode Island Navigation Company, owner of the steamship Hirondelle, under a contract of the same date, viz., July 1, 1937, as a part of the ship radio station, and that the contract in regard to its ownership and removal contained substantially the same provisions as were contained in the contract for installation of the radio telegraph equipment.

That the equipment installed by the Radiomarine Corporation of America on the steamship Hirondelle, including the automatic alarm equipment, which was a device used to automatically notify certain officers of the ship and the officer in charge of the radio telegraph operators on board the ship of distress calls from other ships, was installed as equipment for the operation of a ship radio telegraph station aboard the steamship Hirondelle, and that it was agreed between the steamship owner and the Radiomarine Corporation of America that said station should be operated by said Radiomarine Corporation of America, and

said equipment used as a part thereof, in the conduct of the primary business of the Radiomarine Corporation of America; namely, the operation of a public service marine communications system.

In The Augusta (D.C.) 15 F.(2d) 727, the same question was presented as here, and the court says:

"[1] In a suit for damages resulting from a collision the ship is considered as the offending thing, the actual wrongdoer, and the lien for damages arising from the collision is superior to all other pre-existing liens, those for supplies, repairs, bottomry bonds, etc., with the possible exception of sailors' wages, although there are cases subordinating this lien also. The John G. Stevens, 170 U.S. 113, 18 S.Ct. 544, 42 L.Ed. 969.

"[2] A ship is considered as consisting of the hull and engines, tackle, apparel, and furniture of all kinds. Benedict's Admiralty, par. 157. This, of course, is elemental, and requires no citation of authority. It is contended on behalf of the Radio Corporation that the wireless is not a necessary part of the equipment of a vessel, or at least was not such a necessary part of the Augusta, as there is no law of the United States requiring its installation.

"[3] It seems to me that the wireless, being on the ship, formed part of her equipment, regardless of who the actual owner might be. In these days wireless telegraph apparatus is part of the usual equipment of all steamers of any considerable size. If it was not considered necessary, it would not have been on the Augusta."

It is manifest that Judge Foster had in mind only the priority of conflicting liens, and the rules there to be applied, and not a case where the apparatus was put on the ship to be used in a special or separate business from that of the operation of the ship, and the title was reserved in the operator of such business.

He does not mention this question, but relies on the Stevens Case, 170 U.S. 113, 18 S.Ct. 544, 42 L.Ed. 969, which was one of priority of liens. He assumes that as the wireless was on the ship it formed a part of her equipment and became subject to her liabilities. In the instant case, that is the point in dispute.

The Augusta was followed by The Katherine (D.C.) 15 F.(2d) 387.

In The Mildred (C.C.) 43 F. 393, 395. Judge Brown had before him a case where

226

the owner of a fire pump and hose leased the same to the owner of The Mildred at a fixed sum per year, to be used on such tug, that such pump was bolted to the hull, and was also connected to the boiler by pipes. He says:

"In the case under consideration, the proof is clear that the fire-pump and hose belonged to the petitioner, and had been leased to the owner of the vessel at a certain fixed sum per year. Now, while it is quite true that if an entire vessel be leased to a charterer, debts contracted by him for supplies furnished to such vessel would constitute a lien, I am not prepared to say that this rule would apply to property hired by him, not for the general outfit of the vessel as a vessel, but as an outfit for a special business or object. I am rather inclined to think that the common-law doctrine in relation to fixtures would be applicable to a case of this kind, and that, unless there was an intention on the part of the owner of the outfit that it should become a part of the permanent appurtenances of the vessel, he would be entitled to reclaim it. * * *

"It seems to me that it would be throwing a needless obstacle in the way of maritime commerce to hold that a master could not hire, nor an owner lend, personal property for the use of a vessel except at the risk of its becoming a part of such vessel, and liable for its debts. In the salvage business, particularly, it is the constant practice of the owners of steam-tugs to hire a wrecking outfit for the rescue of vessels in distress, but it has never been supposed that such outfit was subject to the lien of the sailors for their wages, of the material-men for their coal and provisions, or of the owner of the salved vessel for the non-performance of its contract on the part of the tugs, whether such third parties knew that such outfit did not belong to the tug or not. In such case the question is not determined by their belief, but by the fact."

In The Mildred Case, the pump and hose were to be used by The Mildred in its fire fighting, but not in its navigating; here, the radio outfit was to be used by the radio company in the conduct of its business.

The Mildred was followed by Judge Bledsoe in the Southern Division of California, in the Steam Yacht Frontiersman, March 23, 1925, in an opinion not published,[1] where the facts were similar to the instant case, where he released a Marconi outfit from seizure.

In Learned v. Brown, 94 F. 876, 884 (C.C.A.) where a piano was placed on a boat under a verbal arrangement as an advertisement and not sold to the boat, but to be removed at the pleasure of the owner, Judge Pardee, speaking for the court says: "From these facts, it is clear that the Medine Music Company never parted with its ownership of the piano, and the owners of the boat never bought the same. The mortgage never covered the piano, as it never formed a part of the property of the boat, nor constituted any necessary part of her tackle, apparel, or furniture."

This case was followed by The Showboat (D.C.) 47 F.(2d) 286, 287:

"But the furnishings which were put on board merely for use in the restaurant and dance hall did not become such a part of the vessel that the title of the conditional vendor is postponed to that of the lienors."

"If the apparatus is on board for a special purpose and not as a part of the general equipment, it is not liable although the lien claimant is ignorant of its special ownership." 38 Corpus Juris, § 20, page 1204.

I think The Mildred and Learned v. Brown lay down the rule that controls the instant case. The radio business, while conducted on the Hirondelle, was entirely separate and apart from the navigation of that ship, and while it was of value to the ship, it was not the business of the ship any more than a barber shop, operated on a large passenger ship under a lease of space from the ship, would be a part of the navigation of the ship, though it would be of value to such ship to have it on board.

Considering the almost universal use of the radio on steamships, the question is of great importance and much would depend on whether the outfit was bought and operated by the ship, or as an independent business by the radio company.

An order will therefore be entered releasing the radio and alarm equipment from the seizure and sale, and ordering the same to be delivered to the Radiomarine Corporation of America.

1. No opinion for publication.