**FIRST NATIONAL BANK & TRUST COMPANY OF ESCANABA, a banking corporation, Plaintiff,**

v.

**OIL SCREW OLIVE L. MOORE and BARGE WILTRANCO I and their respective engines, boilers, boats, machinery, tackle, apparel, and furniture and Escanaba Towing Company, Inc., a Michigan corporation, Defendants.**

No. M–17–73 C.A.

United States District Court,
W. D. Michigan, S. D.
Nov. 14, 1973.

Richard E. Fleury, Detroit, Mich., John R. Beauchamp, Hansley, Neiman, Peterson & Beauchamp, Escanaba, Mich., for defendants.

Thos. Butch, Escanaba, Mich., Miller, Canfield, Paddock & Stone, by Wolfgang Hoppe, Christopher J. Dunsky, Detroit, Mich., for plaintiff.

Hansley, Neiman, Peterson & Beauchamp by Arthur A. Neiman, Escanaba, Mich., for claimant Frank Stropich, d/b/a Stropich Oil Co.

Ernest L. Olivares, Escanaba, Mich., Charles D. Meadows, Foster, Meadows & Ballard, Detroit, Mich., for claimant Seagulf Marine & Industrial Products, Ltd., Montreal, Canada.

John G. Wildermuth, Beverly Hills, Cal., for claimant, Litton Systems, Inc.

John T. Mitchell, Bay City, Mich., for claimants Robert Bosk, d/b/a Bosk Paint & Sandblast, Delta Home Improvement, Inc., Est. of Henry Feathers, Dec., Iola Feathers, wife of deceased, and others, Wm. W. Stender.

Robert E. LeMire, Jr., Escanaba, Mich., for claimant Walter F. Johnson, d/b/a Walt's Welding Service.

Hansley, Neiman, Peterson & Beauchamp, by Frank A. Stupak, Jr., Escanaba, Mich., for claimant Ray Pakarinen and Don Killoran.

Hansley, Neiman, Peterson & Beauchamp, Escanaba, Mich., for claimant Employers Ins. of Wausau.

Robert E. LeMire Jr., Escanaba, Mich., for claimant Fred I. Costell, d/b/a C. & H. Contracting Co.

Robert J. DeGrand, Escanaba, Mich., for claimant B. L. & G. Boiler Works, Inc.

Robert W. Hansley, Escanaba, Mich., for claimant Verner Newmann.

Chris Cain pro se.

## OPINION AND ORDER

FOX, Chief Judge.

On April 30, 1971 defendant Escanaba Towing Company (hereinafter, the Company) executed and delivered to plaintiff First National Bank and Trust Company of Escanaba (hereinafter, the Bank) a preferred fleet mortgage covering the defendant vessels "Olive L. Moore" and "Wiltranco I," owned by the Company. The mortgage secured loans from the Bank to the Company evidenced by a promissory note in the amount of $243,000, executed on or about the same date. On June 6, 1972 this note was replaced by a second promissory note in the amount of $241,359.81 secured by the mortgage. Upon default of payment by the Company, plaintiff Bank·brought this action in admiralty against the two vessels and the Company, to foreclose its preferred ship mortgage. A number of intervening parties have filed additional claims against the defendants.[1]

On March 28, 1973, the United States Marshal seized the vessels in Escanaba, Michigan pursuant to court order. Aboard the Wiltranco at the time of seizure was an Airman air compressor, Model PDR 600 CFM, Serial No. 14–60107, a claim to which has been filed by Seagulf Marine and Industrial Products, Ltd. (hereinafter, Seagulf).

An order of this court filed April 26, 1973 adjudged the Bank's mortgage to be a valid and subsisting preferred

---

1. Two of these claims were subsequently recognized as constituting preferred maritime liens for seamen's wages under 46 U.S.C.A. § 953(a). The court directed payment of these priority claims by order filed August 30, 1973.

mortgage lien upon the vessels and their appurtenances in the amount of $241,359.81, entered the default of Escanaba Towing, foreclosed the mortgage and ordered the sale of the vessels together with their appurtenances by the Marshal. The order also authorized the Bank to bid at the sale by offering to execute a full or partial satisfaction of its judgment.

The Marshal sold the vessels on May 17, 1973 in three separate lots: first, the Airman air compressor on board the Wiltranco; second, the Wiltranco and all her appurtenances less the air compressor; and finally, the Olive L. Moore and all her appurtenances. The air compressor and the Olive L. Moore were sold to the Bank in exchange for its offer to execute partial satisfaction of judgment, $32,000 for the Olive L. Moore and $9,500 for the air compressor. The Wiltranco was sold to a third party for $61,000.

The sales of the Olive L. Moore and the Wiltranco were confirmed upon the Bank's motion by orders of this court filed May 25, 1973. The sale of the air compressor was not confirmed, in view of the claim to the compressor put forth by Seagulf. The court released the compressor to the Bank to hold for disposition according to further orders of the court, a stipulation having been filed by the Bank in the amount of $20,000 to secure its compliance.

Seagulf moved for summary judgment on its claim to recover the compressor; in opposition, the Bank moved for summary judgment dismissing Seagulf's claim. Additionally the Bank requested that its previously filed motion for confirmation of the sale of the compressor be decided at the same time as the summary judgment motions. The Bank also moved for an order declaring its preferred ship mortgage to be prior to Seagulf's lien, if any, for unpaid rent and/or for the value of the compressor. The matter is presently before the court on these motions.

The facts relating to the compressor are essentially uncontested.

While the Wiltranco was located in the vicinity of the St. Catherine Locks near Montreal, her steam boiler burst. The boiler was used to provide power for operation of the barge's winches. The barge could not proceed through the St. Lawrence Seaway on its return voyage to Michigan without operative winches for hauling lines in accordance with Seaway regulations. To enable the barge to move through the Seaway, Escanaba Towing entered into a rental agreement with Seagulf on October 24, 1972 by which Seagulf would provide the air compressor on board the barge to serve as a temporary source of power for the winches until the vessel could be brought to port for repairs to its boiler. It was agreed that the compressor was to be returned to Seagulf upon the vessel's arrival at port.

Once the compressor was brought aboard, the Wiltranco proceeded through the Seaway. When the Marshal seized the vessel the compressor was still on board because previous attempts to remove it had proven unsuccessful—adequate crane facilities to lift the compressor from the barge at the place it was then moored were unavailable.

Three affidavits have been filed by Seagulf in conjunction with its motion. The affidavit of Clyde Van Enkevort, president of Escanaba Towing, affirms the facts as related above, emphasizing that the use of the leased compressor was merely a temporary or "stop gap" addition to the permanent boiler and that all parties understood that normal operation of the boiler would resume as soon as repairs could be made. It further states that the lease agreement was for only a specifically stated time period, renewable only by agreement with the lessor, that the agreement did not contain a purchase option clause and that Escanaba Towing at no time acquired or sought to acquire any interest in the compressor except that of a lessee. Regarding the unsuccessful attempt at removal, Van Enkevort states that in December 1972 the captain of the Wiltranco had docked the vessel

without regard to the inconvenience in removing the unit caused by his positioning of the vessel. That in several attempts at removal the crane could not be made to reach the far side of the barge where the compressor was located. That only by moving crane equipment onto the ice could the removal be effected and this was considered too great a risk due to the possibility of a breakthrough on the ice. Finally, he states that the court proceedings in this matter began before the ice melted and the barge could be turned around.

The affidavit of Edward Zeagman, president of Seagulf, states that Seagulf is lessee of the air compressor it leased to Escanaba Towing; that the compressor is owned by Perco, Ltd., and was leased by Perco to Welding Engineers, Ltd. who in turn leased it to Seagulf. Seagulf enclosed copies of the leases from Perco to Welding and from Welding to Seagulf.

▇ In addition, Seagulf submitted the joint affidavit of William Blaxall, an officer of Welding Engineers, Sam Hasegawa, an officer of Perco, and Zeagman. This document affirms that the leases involved herein are valid and subsisting as leases and have not been annulled or cancelled in any manner. It is further stated that Seagulf is authorized on the part of all affiants to pursue the claim for return of the compressor.[2]

### I.

Seagulf claims it has the right to recover the air compressor in question because the unit is not subject to the Bank's preferred ship mortgage on the Wiltranco. Seagulf argues that: (1) Such equipment is not subject to a preferred ship mortgage covering the vessel upon which it is installed when the equipment is not owned by the vessel owner but merely leased, with title remaining in a third party; (2) even if, *arguendo*, such equipment might become subject to traditional non-mortgage maritime liens against the vessel, it does not become subject to a preferred ship mortgage because a preferred ship mortgage is essentially different from a maritime lien and does not extend to property not owned by the vessel owner.

The Bank's opposing argument runs as follows: The compressor, used to power the winches on the Wiltranco, was necessary to the operation and navigation of the vessel because of Seaway regulations requiring ships passing through the Seaway to have powered winches for hauling lines and additionally because a vessel cannot be moved without powered winches for use in docking at the end of its voyage. Since it was necessary to the vessel's navigation and operation, the compressor became an appurtenance of the vessel and therefore subject to all maritime liens against the vessel itself, despite the fact the compressor was not owned by the vessel owner. A preferred ship mortgage has the status of a maritime lien by virtue of the Ship Mortgage Act of 1920. Therefore, the compressor became subject to the Bank's preferred ship mortgage on the Wiltranco.

▇ ▪ The issue thus presented is whether a preferred ship mortgage reaches leased equipment on board the mortgaged vessel. Assuming that in certain circumstances traditional maritime liens may reach leased property on board a vessel against which the liens are asserted, the issue becomes whether preferred ship mortgages are equivalent to maritime liens in this respect. The court has determined that preferred ship

2. The Bank presented an argument to the effect that Seagulf's interest in the compressor is insufficient for Seagulf to intervene for recovery of the unit. Given the sworn statements contained in the affidavits filed herein, which affidavits the Bank has not contested, the court has found Seagulf's interest sufficient to support its intervention and claim in compliance with Admiralty Rule C(6) and Federal Rule of Civil Procedure 24(a). Neither rule requires an ownership interest on the part of the claimant. Seagulf's interest as a lessor of the unit, though not its owner, is sufficient.

mortgages and maritime liens are not so equivalent, that these mortgages do not reach such leased property.

The preferred ship mortgage is a creature of the Ship Mortgage Act of 1920 (hereinafter, the Act), 46 U.S.C.A. §§ 911–984, which comprises section 30 of the Merchant Marine Act of 1920. Under the Act, a valid ship mortgage which meets the recording and other requirements of 46 U.S.C.A. § 922 shall have the preferred status the Act provides. It is stated in 46 U.S.C.A. § 951 that a preferred mortgage "shall constitute a lien upon the mortgaged vessel in the amount of the outstanding mortgage indebtedness secured by such vessel." Further, this section provides that, upon default, "such lien may be enforced by the mortgagee by suit in rem in admiralty." The special status accorded preferred ship mortgages is defined in 46 U.S.C.A. § 953 which states in subsection (b) that the preferred mortgage lien shall have priority over all claims against the vessel except (1) preferred maritime liens and (2) expenses and fees allowed and costs taxed, by the court. Subsection (a) of 46 U.S.C.A. § 953 defines the term "preferred maritime lien" as: (1) a lien arising prior in time to the recording and endorsement of a preferred mortgage; or (2) a lien for damages arising from tort, for stevedore's wages under certain circumstances, for wages of the vessel's crew, for general average, and for salvage, including contract salvage.

The Bank concedes that before the Act mortgages on vessels were not considered maritime liens. Its argument is that mortgages which meet the procedural requirements of the Act and therefore are accorded the preferred status the Act provides, *do* become maritime liens. As the Bank points out, there are

statements in certain commentaries and cases to the effect that, under the Act, preferred ship mortgages constitute maritime liens. However, these sources appear to make the assertion primarily in reference to the fact that the Ship Mortgage Act [3] allows for enforcement of the lien of a preferred ship mortgagee by an in rem action in admiralty, a means of enforcement which formerly was available only to traditional maritime liens under the general principles of admiralty law. These sources do not appear to have analyzed the question whether preferred ship mortgages are equivalent to strict maritime liens in that they reach every sort of property reached by maritime liens.[4]

The Bank argues that since a preferred ship mortgage can be the basis of an admiralty action in rem the mortgage must be a maritime lien for the right to institute an in rem proceeding and the existence of a maritime lien are correlatives—the proceeding can be taken only where there is a maritime lien.

 The court disagrees. While the equation of in rem actions and maritime liens may be valid as a matter of general, non-statutory maritime law, it does not hold absolute over the power of Congress to modify admiralty and maritime law by legislation.[5] Indeed, Admiralty Rule C(1) recognizes that Congress may provide in rem enforcement for rights which do *not* constitute maritime liens:

"(1) An action in rem may be brought: (a) To enforce any maritime lien; (b) Whenever a statute of the United States provides for a maritime action in rem or a proceeding analogous thereto."

Thus it is sufficient for the bringing of an admiralty action in rem that the

---

3. 46 U.S.C.A. § 951, supra.

4. See The Bay Belle, 215 F.Supp. 72 at 78 (D.Md., 1963), aff'd. 324 F.2d 954 (4th Cir. 1963) ; The Fort Orange, 5 F.Supp. 833 at 838 (S.D.N.Y.1963) ; Bard v. The Silver Wave, 98 F.Supp. 271 at 275 (D.Md., 1951) ; G. Canfield, "The Ship Mortgage Act of 1920,"

22 Mich.L.Rev. 10 at 10 (1923) ; 1 Knauth, Benedict on Admiralty § 61, 124 (6th Ed. 1940).

5. The very creation of preferred ship mortgages was an exercise of that power. See Detroit Trust Co. v. The Barlum, 293 U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176 (1934).

right to be enforced is a maritime lien *or* that Congress has provided by statute for enforcement of the right in rem.[6] Hence we cannot conclude that preferred ship mortgages constitute maritime liens with all the historically developed attributes of such liens, simply because the mortgages may be enforced in rem.

The major basis of the court's decision is drawn, however, from the well reasoned analysis presented in United States v. F/V Golden Dawn, 222 F.Supp. 186 (E.D.N.Y.1963). Like the present case, Golden Dawn was an action in admiralty to foreclose a preferred ship mortgage wherein an intervening petitioner sought to reclaim, free from the mortgage, equipment it allowed to be installed on the mortgaged vessel under a lease. There involved was certain echo-depth sounding equipment known as the "Fishfinder." The court ruled in favor of the petition to reclaim, stating:

> "No statutory provision affects Raytheon's title to the Fishfinder, and it is good against a preferred ship mortgage having no status other than that given to it by 46 USCA §§ 922, 953, 974." 222 F.Supp. at 186.

The court conceded that removable, self-complete equipment such as the Fishfinder would be considered part of the "vessel, her tackle, apparel and furniture" when owned by the vessel's owner and used to further its particular objectives as the kind of vessel it is, and that a ship mortgage would ordinarily reach such equipment. Nonetheless, the court reasoned:

> "But that does not mean that such a mortgage as the present one reaches leased equipment that is aboard the ship when it is mortgaged or is added after the mortgage is given." 222 F. Supp. at 188.

However, while recognizing the special status accorded to preferred ship mortgages by the Ship Mortgage Act, the Court distinguished perferred ship mortgages from traditional, non-mortgage maritime liens:

> "The present mortgage has the preferred status defined in 46 U.S.C.A. § 953 and the access to admiralty for enforcement granted to it by 46 U.S. C.A. § 951; it has not the nature of a preferred maritime lien nor does it operate as they do; it remains a security instrument pledging, essentially, the mortgagor's interests of ownership for the payment of his—not the ship's—debts. *Nothing in the nature of the ship mortgage, nor in the terms of its statutory implementation, suggests that its lien should extend to what the mortgagor did not own and had no right to acquire.*" 222 F.Supp. at 188. (Emphasis supplied.)

It was concluded that even if traditional maritime liens reach leased property, there is no reason to extend the principle to the unanalogous case of preferred ship mortgages.

It is true that there are certain factual differences between Golden Dawn and the present case. In Golden Dawn, the leased equipment was installed before the recording of the mortgage, and the equipment was marked with tags identifying the ownership of the lessor. In the present case the compressor was installed well after the recording of the mortgage and we are not told whether it bore notice that title was not in the vessel owner. The Bank contends that because of these differences the Golden Dawn court would have decided the present case differently. It is clear, however, that the Golden Dawn decision does not rest on these factual bases. The language of the opinion herein quoted shows that the court founded its decision upon the essential difference between a preferred ship mortgage and a maritime lien—not upon the fact that the lease came first nor upon notice of

---

6. "Supplemental Rule C(1) permits an action in rem to be brought to enforce any maritime lien. . . . An action is also available under the Supplemental Rules whenever a statute of the United States provides for a maritime action in rem or a proceeding analogous thereto." Wright & Miller, Federal Practice and Procedure: Civil § 3221.

the lessor's ownership provided by the affixed tags. Indeed the court reveals, in the second passage quoted above, that it feels ship mortgages should not be found to reach equipment which is on board the ship when it is mortgaged or is added after the mortgage is given. 222 F.Supp. at 188. Further, if notice to mortgagees of the separate ownership of leased equipment should be considered, certainly no mortgagee can claim to have been misled when, as in the present case, the leased property was not even on board the vessel at the time he accepted a mortgage of the vessel as security for his loan.

The reasoning of Golden Dawn was adopted by the Fifth Circuit in C.I.T. Corporation v. Oil Screw Peggy, 424 F. 2d 767 (5th Cir. 1970) wherein the question was whether a preferred ship mortgage covered leased radar equipment aboard the vessel at the time of seizure and sale. Oil Screw Peggy further belies any attempt to limit Golden Dawn factually, for it involved equipment which was leased to the vessel owner after the execution of the mortgage, and makes no mention of any form of notice regarding the separate ownership of the leased equipment.

In this case, the Fifth Circuit noted that the equipment was not intended to become a permanent part of the ship and that there was no evidence or claim that it was so imbedded that removal would destroy the vessel. The lease agreement disclosed no intent to pass title and provided for possession to revert to the lessor at the end of the lease period or upon default of payment. The court stated:

"This case does not involve rival lien 'priorities.' Rather, it concerns an *ownership* interest in equipment leased to the ship's owner and installed aboard the vessel." 424 F.2d at 768.

The court then recited the Golden Dawn distinction between the nature of a preferred ship mortgage as a security in-strument pledging the mortgagor's ownership interests for the payment of *his* debts, and that of a maritime lien as representing a debt of the vessel itself. The court ruled that the leased radar equipment was not subject to the preferred ship mortgage.

In contrast to the holdings in Golden Dawn and Oil Screw Peggy there are cases, as cited by the Bank, which have held that property merely leased or otherwise unowned by the vessel owner but installed upon a mortgaged vessel does become subject to a preferred ship mortgage. Each of these cases, without explicitly stating as a conclusion that preferred ship mortgages constitute maritime liens, simply treated them as such.

First Suffolk National Bank v. The Air Brant, 125 F.Supp. 709 (E.D.N.Y. 1954), is the earliest of these cases. Here, after the recording of the preferred ship mortgage, certain fish pumps and pertinent equipment were installed aboard the mortgaged vessels under a conditional sales agreement; certain blocks and fish boat davits on loan to the vessel owner were also installed. The intervening parties sought permission to remove these items before the Marshal's sale. The court, after stating that this removal would reduce prospective bids at the sale, concluded:

"In any event, all of the above items of equipment are essential to the navigation and operation of these vessels as fishing vessels, and being part of the *res*, are subject to process *in rem* regardless of title. See The Augusta, 5 Cir., 15 F.2d 727; The Katherine, 5 Cir., 15 F.2d 387; The Hope, 1 Cir., 191 F. 243; Learned v. Brown, 5 Cir., 94 F. 876; The Showboat, 1 Cir., 47 F.2d 286; Turner v. United States, 2 Cir., 27 F.2d 134; The Joseph Warner, 1 Cir., 32 F.Supp. 532; The Hirondelle, D.C., 21 F.Supp. 223; The Frolic, 1 Cir., 148 F. 921." 125 F. Supp. at 710.

None of the cases cited as authority in this passage involved preferred ship

mortgages; all involved traditional maritime liens of one sort or another. Thus the court merely assumed that since equipment not owned by the vessel owner, may become part of the *res* to which maritime liens attach, such equipment may also become part of the *res* to which a preferred ship mortgage attaches. The court does go on to speak of the Ship Mortgage Act, supra, its policy of establishing sound security in favor of loans to ship owners and the priority it accords a recorded ship mortgage over subsequent contract liens. 125 F.Supp. at 710. Yet, in view of the fact that before the Act ship mortgages did not constitute maritime liens, but were quite distinct from them in nature, the court does not explain how the Act transforms these mortgages into maritime liens.

The Bank also cites United States v. F/V Sylvester F. Whalen, 217 F.Supp. 916 (D.Ma., 1963), which held that a fathometer and radar equipment leased for installation aboard the vessel before the execution of a preferred ship mortgage were subject to the mortgage. Finding that the equipment was appurtenant to the vessel and thus subject to maritime liens *regardless* of ownership, this court also equated preferred ship mortgages with maritime liens. As authority, the opinion simply cites a number of maritime lien cases and The Air Brant, supra.

The Bank points out that the court in Golden Dawn stated that the Whalen case "can be differentiated as dealing with navigational equipment," [7] and asserts that the Golden Dawn court did not disagree with the Whalen holding but would have held differently had Golden Dawn involved equipment necessary to the navigation and operation of the vessel. However, quoting only the above portion of the Golden Dawn court's statement does not convey the court's basic meaning for it further said, in relation to Whalen:

"The decision was however, put on the ground that if the equipment was truly appurtenant (and the Court found that it was), it fell within the embrace of the mortgage notwithstanding that the shipowner was only a lessee of the equipment; the Court accorded the ship mortgage the status of a strict maritime lien *rather than treating it as a non-maritime security device that has been given certain statutory implementation.*" 222 F. Supp. at 190. (Emphasis supplied.)

Since the Golden Dawn opinion had stated only two pages earlier that preferred ship mortgages are *not* to be accorded the status of strict maritime liens and cannot reach equipment merely leased by the shipowner, we are unable to conclude that the court "did not disagree" with the holding of Whalen, or would have decided Golden Dawn differently had it involved equipment more directly related to navigation.

The Bank further cites language in Payme v. SS Tropic Breeze, 274 F.Supp. 324 (D.P.R.1967), rev'd. other grounds, 1 Cir., 412 F.2d 707, which points to the same result as reached in The Air Brant, supra, and Whalen, supra. This language adds little of substance to the factors which have already been discussed.

Clearly the policy of the Ship Mortgage Act was to spur incentive for the financing of shipowners in an effort to strengthen a faltering merchant marine. See Detroit Trust Co. v. The Barlum, 293 U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176 (1934). In order to accomplish this, a powerful security device was necessary. The ordinary ship mortgage was not adequate to the purpose. It could not be foreclosed in rem in admiralty and in terms of priority, the mortgagee could realize only what remained after maritime liens had been satisfied. Thus the Act created the status of preferred ship mortgages, providing that mortgages recorded in compliance with the

---

7. 222 F.Supp. at 190.

Act would have access to admiralty in rem for foreclosure and priority over all maritime liens except those defined as preferred. However, neither the policy nor the terms of the statute require that the preferred ship mortgage be considered a maritime lien in that it may reach property not owned by the vessel owner. Traditionally a mortgage has been treated as a pledge of the mortgagor's ownership interest in property as security for a debt. It would do great violence to this accepted principle regarding the nature of a mortgage to hold that preferred ship mortgages may reach property not owned by the mortgagor. On the other hand, it would not inhibit, rather it would seem to serve adequately both policy and terms to hold that the Act gives to the preferred ship mortgage priority over certain maritime liens and access to admiralty in rem but *only* as to property owned by the mortgagor. The court would be hesitant to take the *former course without stronger* evidence that this is what Congress intended.

■ For these reasons the court concludes that the air compressor leased by Seagulf for use on the Wiltranco is not subject to the Bank's preferred ship mortgage.

## II.

In further argument the Bank contends that whether or not the compressor became subject to the Bank's preferred ship mortgage, it did become subject to maritime liens against the Wiltranco and therefore was properly seized and sold to satisfy such liens.

■ The court must note initially that even a finding that the compressor

was subject to maritime liens against the vessel would not justify confirmation of the sale of the unit as a proper step toward satisfying such liens. The compressor was sold to the Bank. The consideration offered was execution of partial satisfaction of the judgment the Bank obtained in foreclosure of its preferred ship mortgage. Therefore confirmation of the sale would have the effect of appropriating the value of the compressor for satisfaction of the Bank's mortgage alone and would not in any way contribute to the satisfaction of maritime liens. Preferred maritime liens superior to the Bank's mortgage under 42 U.S.C.A. § 953(a) would not benefit since the sale produced no value for such liens to reach. Likewise liens inferior to the mortgage would not benefit. While in different circumstances it might be argued that any addition to the group of assets available to satisfy the mortgage would enlarge the remainder left for satisfaction of inferior liens, no such result could occur in the present case since the amount of the Bank's mortgage far exceeds the total amount available for distribution.[8]

These considerations, while determinative as to confirmation of the sale, do not dispose of the essence of the Bank's argument as an objection to the grant of summary judgment to Seagulf on its claim to recover the unit. In this regard we must turn to the difficult question: Did the compressor become an appurtenance subject to maritime liens against the Wiltranco?

■ It is clear that under certain circumstances equipment aboard but not of common ownership with a vessel may become subject to maritime liens against

8. It is true that the Court authorized the Bank to bid in the above described manner by order filed April 26, 1973. However, at the time of the order none of the intervening lien claimants made objection to this manner of bidding nor had any of the claims been established as valid maritime liens.

While the bid was proper, in the present context it renders invalid the Bank's proposition that the sale of the compressor may be seen as a means of satisfying maritime liens against the vessel. The sale produced nothing toward the satisfaction of any claim save the Bank's mortgage.

**1392**

the vessel. In cases wherein such equipment was found to be appurtenant courts have generally stated as a basis for decision that the equipment had become part of the general equipment of the vessel; that it had become an integral part of the vessel and necessary for the operation or navigation of the vessel *qua* vessel in the general purposes for which it was intended, not merely for a special purpose. See The Hope, 191 F. 243 (D.Mass., 1911); The Showboat, 47 F.2d 286 (D.Mass., 1930); The Hirondelle, 21 F.Supp. 223 (S.D.Ala., 1937); United States v. F/V Sylvester F. Whalen, 217 F.Supp. 916 (D.Maine, 1963).[9] Certain courts seem also to have relied upon a notice theory—whether or not the materialmen who provided supplies, the mechanics who made repairs, the seamen who hired on, the lenders who extended credit or the salvagers who resurrected the vessel were induced to act or did so act on the reasonable assumption that the equipment in question was part of the vessel and thus could be reached, if necessary, to satisfy their claims for payment. The Edwin Post, 11 Fed. 602 (D.Del., 1882); The Hope, supra. In borderline cases, courts have borrowed from the law of fixtures as applied in the field of real property and have based their decisions on the determination whether or not it was the intent of the parties that the equipment become a permanent part of the vessel. The Mildred, 43 F. 393 (E.D.Mich., 1890); W. R. Grace & Co. v. Charleston Lighterage & Transfer, 95 F.Supp. 249 (E.D.S.C., 1951).

The instant case presents such a borderline situation. Having considered all factors, the court has determined that the compressor did not become an appurtenance of the Wiltranco and thus did not become subject to any maritime liens against the vessel. While it can be said that the compressor briefly was necessary for the vessel's navigation and operation in the sense that the vessel could not return to port through the St. Lawrence Seaway without powered winches in accordance with Seaway regulations, it did *not* become an integral part of the vessel or a segment of the vessel's general equipment. The use of the compressor was an emergency, stop-gap measure. The temporarily inoperative boiler and associated piping, the normal source of power for the winches, remained in place aboard the vessel as part of its general equipment. The value of the compressor was not wholly nor even predominantly incident to its use on the vessel. It was the intent of the parties that the compressor be removed as soon as the Wiltranco could be brought to port for repairs. Only fortuitous circumstances prevented its removal before seizure. Further, it seems apparent that in this setting none of the lien claimants could have acted in reliance on the compressor as an appurtenance of the vessel.

The chain of leases by which Seagulf obtained the compressor for the benefit of Escanaba Towing (all of which leases were executed on or about the same day) demonstrates the lengths to which Seagulf was willing to go in order to aid a shipper in a difficult, emergency situation. Unlike the episode involved in The Frolic, 148 F. 921 (D.R.I., 1906), wherein a leased chronometer was forfeited along with the vessel for violation of the Chinese exclusion acts, there is no policy reason here to support penalizing

---

9. Perhaps as an alternate means of determining whether equipment had become integral to a vessel, one court seems also to have considered the question whether the value of the equipment existed solely in relation to its use aboard the vessel or would still exist apart from such use:

"Its value was wholly incident to the ship and for its use, and it was a necessary appurtenance to the ship's business. There is no evidence of any other value." Turner v. United States, 27 F.2d 134 at 135 (2nd Cir. 1928).

Seagulf. Rather, in the circumstances of the present case the court concludes:

> "[I]t would be throwing a needless obstacle in the way of maritime commerce to hold that a master could not hire, nor an owner lend, personal property for the use of the vessel except at the risk of its becoming a part of such vessel, and liable for its debts." The Mildred, supra, 43 F. at 394–395.

None of the cases cited by the Bank are so closely similar to the situation here involved that they must be deemed controlling. Given the myriad variations which are possible, each case must be decided on its own factual base. The court decides only that, in view of the circumstances of this case, the compressor did not become an appurtenance of the Wiltranco.

### III.

The Bank has also moved for an order declaring its preferred ship mortgage superior to Seagulf's lien, if any, for unpaid rent and for the value of the compressor. Seagulf's claim for the value of the compressor has been superseded by its claim for recovery of the unit and thus is removed from consideration. Seagulf's claim for unpaid rent does not constitute a preferred maritime lien under 46 U.S.C.A. § 953(a) and therefore is subordinate to the Bank's preferred ship mortgage.

### CONCLUSION

For the reasons stated herein, plaintiff's motions for confirmation of the sale of the compressor and for summary judgment dismissing Seagulf's claim to the compressor are denied; Seagulf's motion for summary judgment on its claim to recover the compressor is granted; plaintiff's motion for an order declaring its preferred ship mortgage superior to Seagulf's claim for unpaid rent is granted.

It is so ordered.